NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2919-15T2

OUR LADY OF LOURDES HOSPITAL
– BURLINGTON,

 Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES,

 Respondent-Respondent.

________________________________________________________

 Argued October 3, 2017 - Decided October 25, 2017

 Before Judges Yannotti, Carroll and Mawla.

 On appeal from the Division of Medical
 Assistance and Health Services, Docket No. HMA
 4005-2006.

 James A. Robertson argued the cause for
 appellant (McElroy, Deutsch, Mulvaney &
 Carpenter, LLP, attorneys; Mr. Robertson, of
 counsel and on the briefs; Paul L. Croce and
 Marissa Koblitz Kingman, on the briefs).

 Jacqueline R. D'Alessandro, Deputy Attorney
 General, argued the cause for respondent
 (Christopher S. Porrino, Attorney General,
 attorney; Melissa H. Raksa, Assistant Attorney
 General, of counsel; Ms. D'Alessandro and
 Jennifer Simons, Deputy Attorneys General, on
 the brief).

PER CURIAM

 Our Lady of Lourdes Hospital – Burlington (the Hospital)

appeals from a final decision of the Director, Division of Medical

Assistance and Health Services (Division), which denied the

Hospital's application to recalculate its 1995 Medicaid

reimbursement rates for inpatient services.1 We affirm.

 I.

 Medicaid is a federally-established, state-run program,

Estate of F.K. v. Div. of Med. Assistance & Health Servs., 374

N.J. Super. 126, 133–34 (App. Div.), certif. denied, 184 N.J. 209

(2005), "designed to provide medical assistance," at public

expense, "to individuals 'whose income and resources are

insufficient to meet the cost of necessary medical services,'"

N.M. v. Div. of Med. Assistance & Health Servs., 405 N.J. Super.

353, 359 (App. Div.) (quoting 42 U.S.C.A. § 1396), certif. denied,

199 N.J. 517 (2009).

1
 We note that in October 2016, the court consolidated this appeal
with Atlanticare Regional Medical Center v. Division of Medical
Assistance & Health Services, No. A-0364-15. We have determined
that the appeals should be addressed in separate opinions.
Therefore, we vacate the order consolidating the appeals.

 2 A-2919-15T2
 A state's participation in Medicaid is voluntary, but

participating states must comply with the federal Medicaid

statutes and any regulations promulgated by the United States

Department of Health and Human Services implementing the statute.

Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158,

166 (1998). In addition, states must adopt and adhere to a plan

that establishes the scope of the program and sets forth reasonable

standards for its administration, including a "scheme for

reimbursing health care providers for the medical services

provided to needy individuals." Wilder v. Va. Hosp. Ass'n, 496

U.S. 498, 502, 110 S. Ct. 2510, 2513, 110 L. Ed. 2d 455, 462

(1990). Federal approval of the plan permits states to receive

matching federal funds for applicable medical services reimbursed

through the program. 42 U.S.C.A. § 1396(b).

 New Jersey participates in the Medicaid program pursuant to

the New Jersey Medical Assistance and Health Services Act, N.J.S.A.

30:4D-1 to -19.5, which assigns the responsibility for

administering our state program to the Division. N.J.S.A. 30:4D-

7. The Hospital is an acute care facility that participates and

receives reimbursement for its provision of services covered under

the program.

 In accordance with New Jersey's federally-approved state

plan, those reimbursements are calculated based upon standard

 3 A-2919-15T2
rates for each Diagnosis Related Group, In re Hosps.' Petitions

for Adjustment of Rates for Reimbursement of Inpatient Servs. to

Medicaid Beneficiaries, 383 N.J. Super. 219, 232 (App. Div.),

certif. denied, 187 N.J. 82 (2006), that is, each class of patients

defined by shared characteristics related to diagnosis, procedure,

and other relevant factors, N.J.A.C. 10:52-1.2. In addition,

federal regulations require that those rates be set such that

payments made under the state's Medicaid program do not exceed

upper payment limits established for Medicare, a separate

federally-administered program. 42 C.F.R. § 447.253(b)(2) (2017);

42 C.F.R. § 447.272(b) to (c) (2017).

 In 1993, the Division promulgated regulations that set forth

the calculation methodology at issue here. 25 N.J.R. 2560(a) (May

10, 1993). Among other things, the regulations provide for the

application of an "economic factor" to account for inflation in

setting reimbursement rates:

 The economic factor calculated by the
 Department of Health is the measure of the
 change in prices of goods and services used
 by New Jersey hospitals. After the 1993 rate
 year, the economic factor will be the factor
 recognized under the TEFRA target limitations.

 [Id. at 2568.]

 4 A-2919-15T2
The regulation was codified at N.J.A.C. 10:52-5.17(a). The rule

was later re-codified without change, effective December 21, 1999,

at N.J.A.C. 10:52-5.13.2

 The term "TEFRA target limitations" in N.J.A.C. 10:52-5.17(a)

refers to the Tax Equity and Fiscal Responsibility Act of 1982

(TEFRA), Pub. L. No. 97-248, § 101, 96 Stat. 324, 331-36 (codified

at 42 U.S.C.A. § 1395ww, but since amended). As an incentive to

contain costs, TEFRA imposes "target" limits on the rate of

increase in allowable costs for inpatient services a facility may

recover through reimbursement. Episcopal Hosp. v. Shalala, 994

F.2d 879, 881 (D.C. Cir. 1993), cert. denied, 510 U.S. 1071, 114

S. Ct. 876, 127 L. Ed. 2d 73 (1994).

 When the Division adopted N.J.A.C. 10:52-5.17(a), the TEFRA

provision outlining the legislation's "target amount[s]" stated:

 (A) . . . [T]he term "target amount" means,
 with respect to a hospital for a particular
 12-month cost reporting period--

 (i) in the case of the first such reporting
 period for which this subsection is in effect,
 the allowable operating costs of inpatient
 hospital services (as defined in subsection
 (a)(4)) recognized under this title for such
 hospital for the preceding 12-month cost
 reporting period, and

2
 In this opinion, we refer to the regulation as N.J.A.C. 10:52-
5.17(a), because that was the regulation in effect when this
dispute began.

 5 A-2919-15T2
(ii) in the case of a later reporting period,
the target amount for the preceding 12-month
cost reporting period, increased by the
applicable percentage increase under
subparagraph (B) for that particular cost
reporting period.

(B) . . . .

(ii) . . . [T]he "applicable percentage
increase" for 12-month cost reporting periods
beginning during--

 (I) fiscal year 1986, is 0.5 percent,

 (II) fiscal year 1987, is 1.15 percent,

 (III) fiscal year 1988, is the market
 basket percentage increase minus 2.0
 percentage points, and

 (IV) subsequent fiscal years is the
 market basket percentage increase.

(iii) For purposes of this subparagraph, the
term "market basket percentage increase"
means, with respect to cost reporting periods
and discharges occurring in a fiscal year, the
percentage, estimated by the Secretary before
the beginning of the period or fiscal year,
by which the cost of the mix of goods and
services (including personnel costs but
excluding nonoperating costs) comprising
routine, ancillary, and special care unit
inpatient hospital services, based on an index
of appropriately weighted indicators of
changes in wages and prices which are
representative of the mix of goods and
services included in such inpatient hospital
services, for the period or fiscal year will
exceed the cost of such mix of goods and
services for the preceding 12-month cost
reporting period or fiscal year.

[42 U.S.C.A. § 1395ww(b)(3) (1992).]

 6 A-2919-15T2
Shortly after the Division adopted N.J.A.C. 10:52-5.17(a), TEFRA

was amended to provide an updated schedule of inflationary

increases, which changed the increase that would have been

applicable for the 1995 rate year from the market basket percentage

to a reduced rate based on that percentage:

 [T]he "applicable percentage increase" for 12-
 month cost reporting periods beginning during—

 (I) fiscal year 1986, is 0.5 percent,

 (II) fiscal year 1987, is 1.15 percent,

 (III) fiscal year 1988, is the market
 basket percentage increase minus 2.0
 percentage points,

 (IV) a subsequent fiscal year ending on
 or before September 30, 1993, is the
 market basket percentage increase,

 (V) fiscal years 1994 through 1997, is
 the market basket percentage increase
 minus the applicable reduction (as
 defined in clause (v)(II)), or in the
 case of a hospital for a fiscal year for
 which the hospital's update adjustment
 percentage (as defined in clause (v)(I))
 is at least 10 percent, the market basket
 percentage increase, and

 (VI) subsequent fiscal years, is the
 market basket percentage increase.

 [Omnibus Budget Reconciliation Act of 1993,
 Pub. L. No. 103-66, § 13502(a)(1), 107 Stat.
 312, 577 (codified at 42 U.S.C.A.
 § 1395ww(b)(3)(B)(ii), but since amended).]

 The legislation further provided:

 7 A-2919-15T2
 For purposes of clause (ii)(V)—

 (I) a hospital's "update adjustment
 percentage" for a fiscal year is the
 percentage by which the hospital's
 allowable operating costs of inpatient
 hospital services recognized under this
 title for the cost reporting period
 beginning in fiscal year 1990 exceeds the
 hospital's target amount (as determined
 under subparagraph (A)) for such cost
 reporting period, increased for each
 fiscal year (beginning with fiscal year
 1994) by the sum of any of the hospital's
 applicable reductions under subclause
 (V) for previous fiscal years; and

 (II) the "applicable reduction" with
 respect to a hospital for a fiscal year
 is the lesser of 1 percentage point or
 the percentage point difference between
 10 percent and the hospital's update
 adjustment percentage for the fiscal
 year.

 [Id. § 13502(a)(2), 107 Stat. at 577-78
 (codified at 42 U.S.C.A. § 1395ww(b)(3)
 (B)(v)).]

Moreover, as an incentive for hospitals to maintain efficiency,

TEFRA authorized supplementary bonus payments to hospitals whose

costs remained within these limits or, as the case may be,

penalties for those hospitals whose costs exceeded these limits.

Episcopal Hosp., supra, 994 F.2d at 881.

 II.

 On March 3, 1995, the Division provided the Hospital a

schedule of its Medicaid reimbursement rates for the 1995 calendar

 8 A-2919-15T2
year.3 The Hospital responded on March 22, 1995. It claimed the

Division made thirteen errors in the calculation of its rates.

One of the claimed errors pertained to the Division's

interpretation and application of N.J.A.C. 10:52-5.17(a), the

economic factor regulation. The Hospital stated:

 The regulations require the Division to use
 the TEFRA update factor to adjust costs from
 year to year after 1993. The regulations do
 not include any provision for incorporating
 adjustments to the TEFRA update factor in the
 payment rates. The TEFRA update factors for
 1994 and 1995 have each been understated by
 [one percent]. This error understates the
 Hospital's preliminary cost base.

 In March 1996, the Division advised the Hospital that only

one of the alleged errors, the error regarding the House Staff

Medicaid amounts, was a proper calculation error challenge, and

the other issues raised pertained to the Division's interpretation

of its regulations. In May 1996, the Hospital asked the Division

to further explain its decision.

 In October 1996, the Division informed the Hospital that the

one calculation error had no impact on its rates and it considered

the matter closed. The Hospital filed an administrative appeal,

which the Division dismissed. In re Zurbrugg Mem'l Hosp.'s 1995

Medicaid Rates, 349 N.J. Super. 27, 32–33 (App. Div. 2002). We

3
 At the time, the Hospital was known as Zurbrugg Memorial
Hospital.

 9 A-2919-15T2
reversed the Division's determination and remanded the matter to

the Division for further proceedings. Id. at 29–30.

 On March 8, 2006, the Division issued a decision again denying

the Hospital's request for an adjustment of its rates. The Hospital

then filed a request for an administrative hearing, and in May

2006, the Division transferred the matter to the Office of

Administrative Law (OAL) for an initial decision as a contested

case.

 The OAL placed the case on the inactive list pending a

decision by this court on an appeal challenging amendments to

certain regulations pertaining to Medicaid reimbursements. We

upheld the regulations. In re Adoption of Amendments to N.J.A.C.

10:52, No. A-6649-04 (App. Div. April 26, 2007), certif. denied,

192 N.J. 296 (2007). Thereafter, the OAL reactivated the case.

 In June 2009, the Division filed a motion for partial summary

decision on the Hospital's claim regarding N.J.A.C. 10:52-5.17(a).

While that motion was pending, the Hospital filed two discovery

motions. The first motion sought leave to communicate with R.S.,

who previously had been employed by the Division and the Division's

financial intermediary.4 The Hospital wanted to speak with R.S.

about the Division's interpretation and application of the

4
 We use initials to preserve R.S.'s privacy.

 10 A-2919-15T2
regulation. The Hospital also sought to compel the Division to

produce certain documents it had withheld as privileged.

 On July 5, 2011, the Administrative Law Judge (ALJ) denied

the Division's motion for partial summary decision, finding that

there were genuine issues of material fact pertaining to the

calculation of the hospital's rates. Even so, the ALJ decided that

the term "economic factor" in N.J.S.A. 10:52-5.17(a) refers to the

"applicable percentage increase" under TEFRA rather than the TEFRA

"market basket percentage increase." The ALJ also decided that the

economic factor adjustment does not include the incentive bonus

payments that are available under TEFRA.

 On October 4, 2011, the ALJ ordered the Division to produce

the withheld documents for in camera review. The ALJ also ordered

the Division to provide a specific explanation as to why each

withheld document was either privileged or otherwise not subject

to discovery. The Division thereafter submitted the documents and

explanations to the ALJ.

 In November 2011, the Hospital filed another motion, this

time seeking permission to depose R.S. In August 2012, the ALJ

denied that motion, and the Director later denied the Hospital's

application for administrative review of the ALJ's interlocutory

decision. In September 2012, the Hospital voluntarily withdrew its

claims regarding twelve of the alleged calculation errors, leaving

 11 A-2919-15T2
only the Hospital's claim regarding the Division's decision on the

economic factor adjustment.

 In October 2012, the Hospital filed a motion for summary

decision and in December 2012, the Division cross-moved seeking

the same relief. After hearing oral argument on the motions, the

ALJ issued an initial decision dated November 25, 2015, denying

the Hospital's motion and granting the Division's cross-motion in

its entirety. The ALJ found that there were no genuine issues of

material fact, and the Division was entitled to summary decision

as a matter of law. The ALJ also found that there was no need for

further discovery and denied the Hospital's discovery motions as

moot.

 The ALJ again found that the term "economic factor" in

N.J.A.C. 10:52-5.17(a) refers to the "applicable percentage

increase" under TEFRA, not the TEFRA "market basket percentage

increase." The ALJ also rejected the Hospital's claim that the

Division was required to apply the version of TEFRA that was in

effect when the regulation was adopted in May 1993. In addition,

the ALJ again rejected the Hospital's contention that incentive

bonus payments available under TEFRA should be included in

calculating the Hospital's rates.

 12 A-2919-15T2
 The Director issued a final decision on February 18, 2016.

The Director adopted the initial decision of the ALJ. This appeal

followed.

 III.

 On appeal, the Hospital first argues that the Division erred

in its interpretation of N.J.A.C. 10:52-5.17(a). As noted

previously, the regulation states that an "economic factor" will

be applied to the hospital's rates to account for inflation, and

the economic factor "will be the factor recognized under TEFRA

target limitations." Ibid.

 We note that the scope of our review of an administrative

agency's decision is limited. Circus Liquors, Inc. v. Governing

Body of Middletown Twp., 199 N.J. 1, 9 (2009) (citation omitted).

Our inquiry is limited to the following:

 (1) whether the agency's action violates
 express or implied legislative policies, that
 is, did the agency follow the law; (2) whether
 the record contains substantial evidence to
 support the findings on which the agency based
 its action; and (3) whether in applying the
 legislative policies to the facts, the agency
 clearly erred in reaching a conclusion that
 could not reasonably have been made on a
 showing of the relevant factors.

 [In re Proposed Quest Acad. Charter Sch. of
 Montclair Founders Grp., 216 N.J. 370, 385-86
 (2013) (citing Mazza v. Bd. of Trs., 143 N.J.
 22, 25 (1995)).]

 13 A-2919-15T2
 Although we are not bound by an agency's legal conclusions,

we generally defer to the agency's interpretation of its own

regulations and enabling statutes. Utley v. Bd. of Review, 194

N.J. 534, 551 (2008). We give considerable deference to the

agency's interpretation of its own rules "because the agency that

drafted and promulgated the rule should know [its] meaning[.]"

N.J. Healthcare Coal. v. N.J. Dep't of Banking & Ins., 440 N.J.

Super. 129, 135 (App. Div.) (quoting In re Freshwater Wetlands

Gen. Permit No. 16, 379 N.J. Super. 331, 341–42 (App. Div. 2005)),

certif. denied, 222 N.J. 17 (2015).

 The Hospital argues that the phrase "the factor recognized

under the TEFRA target limitations" in N.J.A.C. 10:52-5.17(a)

refers to the TEFRA "market basket percentage increase," not the

TEFRA "applicable percentage increase." The Hospital notes that

the regulation defines the economic factor as "the measure of the

change in prices of goods and services used by New Jersey

Hospitals." Ibid. The Hospital asserts that the only "factor" that

represents the change in prices of goods and services under TEFRA

is the "market basket percentage increase."

 The principles governing the interpretation of statutes apply

to the construction of rules and regulations. Krupp v. Bd. of

Educ. of Union Cty. Reg'l High Sch. Dist. No. 1, 278 N.J. Super.

31, 38 (App. Div. 1994), certif. denied, 140 N.J. 277 (1995). The

 14 A-2919-15T2
primary goal is to interpret a statute in accordance with the

Legislature's intent, and "the best indicator of that intent is

the statutory language." DiProspero v. Penn, 183 N.J. 477, 492

(2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)).

The court must interpret the words in the enactment in accordance

with "their ordinary meaning and significance." Ibid. (citing Lane

v. Holderman, 23 N.J. 304, 313 (1957)).

 If the statute is clear and unambiguous, the court's role is

"to construe and apply the statute as enacted." Ibid. (quoting In

re Closing of Jamesburg High Sch., 83 N.J. 540, 548 (1980)).

However, if there is any ambiguity in the statutory language that

leads to more than one plausible interpretation, the court may

consider extrinsic evidence, including the legislative history.

Id. at 492–93 (citing Cherry Hill Manor Assocs. v. Faugno, 182

N.J. 64, 75 (2004)).

 We are not persuaded by the Hospital's argument that the

phrase "the factor recognized under the TEFRA target limitations"

in N.J.A.C. 10:52-5.17(a) means the TEFRA "market basket

percentage increase." Such a construction is not compelled by the

plain language of the regulation. The Division did not refer to

the "market basket percentage increase" in the regulation. As the

Division notes, if it had intended that the economic factor would

 15 A-2919-15T2
be the "market basket percentage increase," the regulation would

have said so.

 Rather, the regulation defines "economic factor" to mean "the

factor recognized under the TEFRA target limitations." As the

Division found, TEFRA does not use the term "target limitations,"

but it does use the term "target amount," which is defined in 42

U.S.C.A. § 1395ww(b)(3) to mean allowable operating costs of

inpatient hospital services for a twelve month period, increased

by the "applicable percentage increase" under subparagraph (B) of

that statute.

 The Division noted that under TEFRA, the "applicable

percentage increase is essentially a limit on the rate of increase

in the target amount. The Division reasonably determined that the

term "applicable percentage increase" is consistent with the

concept of "target limitations" in the regulation. Therefore, the

Division properly found that "TEFRA target limitations" referred

to in N.J.A.C. 10:52-5.17(a) is the "applicable percentage

increase" under TEFRA.

 The Division's response to comments submitted when the

regulation was proposed support the Division's interpretation. The

Division indicated that it intended to utilize the TEFRA allowable

increase for the economic factor adjustments provided in the

regulation. The Division noted that the TEFRA allowable increase

 16 A-2919-15T2
had in recent years been "based on the national hospital market

basket rate of inflation." See 25 N.J.R., supra, at 2561.

 As the Division found here, this statement was consistent

with the version of TEFRA that was in effect when the regulation

was adopted. Indeed, TEFRA had provided that in some fiscal years

(1986 and 1987) the "applicable percentage increases" were

specified percentages, not the "market basket percentage

increase." Therefore, the Division's comment recognized that while

the TEFRA allowable increase might be the "market basket percentage

increase," this might not always be the case.

 The Division's interpretation is also consistent with the

State's need to comply with the federal requirement that its

aggregate Medicaid payments will not exceed those for Medicare.

Interpreting the term "economic factor" in N.J.A.C. 10:52-5.17(a),

the TEFRA "applicable percentage increase" allows the Division to

provide the federal agency administering Medicaid the necessary

assurance that it will not exceed the upper payment limits. As the

Division noted, the federal agency allows states to base their

assurances upon the use of the TEFRA limits.

 We are therefore convinced that the Division's interpretation

of the term "economic factor" in N.J.A.C. 10:52-5.17(a) is

consistent with the language of the regulation, the Division's

intent as reflected in the comments provided when the regulation

 17 A-2919-15T2
was adopted, and the purpose of the regulation. We reject the

Hospital's contention that the phrase "TEFRA target limitations"

was a specific reference to the TEFRA "market basket percentage

increase."

 IV.

 The Hospital argues that if the Division correctly

interpreted the term "TEFRA target limitations" in N.J.S.A. 10:52-

5.17(a) to mean the "applicable percentage increase" under TEFRA,

the Division erred by finding that the regulation incorporated

future amendments to TEFRA. The Hospital argues that under the

version of TEFRA that was in effect when the regulation was

adopted, the "applicable percentage increase" was the TEFRA

"market basket percentage increase." The Hospital argues that the

Division could not apply changes to the definition of "applicable

percentage increase" enacted by Congress after the regulation was

adopted.

 In support of this argument, the Hospital relies upon the

principles of statutory construction enunciated in In re

Commitment of Edward S., 118 N.J. 118 (1990). In that case, the

Court stated:

 The general rule is that when a statute
 incorporates another by specifically
 referring to it by title or section number,
 only the precise terms of the incorporated
 statute as it then exists become part of the

 18 A-2919-15T2
 incorporating statute; absent language to the
 contrary, subsequent amendments to the
 incorporated statute have no effect on the
 incorporating statute. Indeed, even repeal of
 the incorporated statute does not ordinarily
 affect the incorporating statute. The latter
 remains in force just as it would if the
 referenced words had been written directly
 into it. On the other hand, if a statute,
 instead of incorporating the terms of another
 statute, incorporates a general body of law,
 the rule is that subsequent changes in that
 body of law do become part of the
 incorporating statute.

 [Id. at 132-33 (citing N. Singer, 2A
 Sutherland Statutory Construction, § 51.07;
 51.08 (Sands 4th ed. 1984 & Supp. 1989)).]

See also Hassett v. Welch, 303 U.S. 303, 314, 58 S. Ct. 559, 564,

82 L. Ed. 858, 866-67 (1938) (noting that when a statute adopts

the provisions of another statute, the adoption incorporates the

statute as it existed at that time and does not include subsequent

amendments to the adopted statute, unless a contrary intent is

indicated). The Hospital's reliance upon the general rule of

construction in Commitment of Edward S. and Hassett is misplaced.

 Here, the Division referred to TEFRA when it adopted N.J.A.C.

10:52-5.17(a), but there is no indication that it intended to

incorporate the provisions of TEFRA which existed at that time.

The Division found that the phrase "the factor recognized under

the TEFRA target limitations" in N.J.A.C. 10:52-5.17(a) was

intended to mean the "target limitations" as determined in

 19 A-2919-15T2
accordance with the version of TEFRA that is in effect for the

year in which the rates are set. It was not intended to incorporate

the specific provisions of TEFRA as they existed at the time the

rule was adopted.

 As the Division notes, the language of N.J.A.C. 10:52-5.17(a)

is forward looking. The regulation states that "the economic factor

will be the factor recognized under the TEFRA target limitations."

Ibid. (emphasis added). The language of the regulation supports

the Division's view that the TEFRA target update factor must be

the inflation factor that is in existence at the time it sets the

rates.

 Moreover, as noted previously, a state participating in the

Medicaid program may use the TEFRA target limitations to provide

the federal government with assurance that the state will comply

with Medicare's upper payment limits. Interpreting the term "TEFRA

target limitations" to incorporated amendments to TEFRA enacted

after the rule's adoption, allows the State to provide the federal

Medicaid agency with assurance that it will comply with the upper-

payment limits.

 The Hospital also argues that the Division's interpretation

of the regulation is in conflict with N.J.A.C. 1:30-2.2(c), which

provides:

 20 A-2919-15T2
 [a]ny agency incorporating any section of a
 source by reference shall adopt and file as a
 rule appropriate language indicating:

 1. What is incorporated including either:

 i. The specific date or issue of the
 section of the source incorporated;
 or

 ii. A statement indicating whether
 the section incorporated includes
 future supplements and amendments.

 2. Where and how a copy of the section
 may be obtained.

 As the ALJ and Director noted in their respective decisions,

the regulation at issue here does not incorporate any specifically

designated sections of TEFRA. The regulation only incorporates a

concept used in TEFRA, specifically, the TEFRA rate of increase.

Therefore, the Division's interpretation of the regulation does

not contravene N.J.A.C. 1:30-2.2(c).

 V.

 The Hospital further argues that the Division erred by finding

that it is not entitled to an incentive bonus payment under TEFRA.

According to the Hospital, the reference in the regulation to

"TEFRA target limits" is a general reference to TEFRA, which

incorporates the entire TEFRA statutory scheme, including

incentive bonus payments for "efficient" hospitals provided for

in that legislation. We find no merit in this argument.

 21 A-2919-15T2
 As the ALJ and Director noted in their respective decisions,

there is nothing in the rule, which suggests the Division intended

to incorporate the entire TEFRA statutory scheme into its Medicaid

ratemaking process. Indeed, incentive or bonus payments are not

mentioned in N.J.A.C. 10:52-5.17(a), in the comments provided when

the rule was proposed in 1993, or in the Division's responses to

those comments.

 Here, the Division found that the intent at the time the rule

was adopted was to use the TEFRA target limitation, specifically,

the TEFRA "applicable percentage increase," as an inflationary

adjustment for determining Medicaid reimbursement rates. Under the

rule, the economic factor is the TEFRA "applicable percentage

increase," and it does not include the TEFRA incentive bonus

payments.

 The Hospital argues that the Division's interpretation of the

regulation is inconsistent with the policies and goals of TEFRA.

The Hospital contends that rather than rewarding efficiency, the

Division "punished" efficient hospitals by providing them with a

lesser increase in their rates than other less efficient hospitals

received. The Hospital therefore argues that the Division's

interpretation of the regulation is arbitrary, capricious, and

unreasonable.

 22 A-2919-15T2
 We are convinced that these arguments are without sufficient

merit to warrant discussion. R. 2:11-3(e)(1)(E). We conclude the

Division did not err by finding that N.J.A.C. 10:52-5.17(a) did

not incorporate the entire TEFRA statutory scheme, including the

incentive bonus payments provided for in TEFRA.

 VI.

 In addition, the Hospital argues that by interpreting the

regulation to incorporate amendments to TEFRA that were not enacted

until after N.J.A.C. 10:52-5.17(a) was promulgated, the Division

improperly engaged in retroactive rulemaking. The Hospital

contends the Division failed to afford the Hospital and other

regulated entities notice of its proposed interpretation of the

rule, and did not provide them with an opportunity to comment, as

required by the Administrative Procedure Act (APA), N.J.S.A.

52:14B-1 to -15. The Hospital contends that because the agency did

not comply with the APA's rulemaking procedures, it was denied due

process.

 The APA defines an "administrative rule" as an "agency

statement of general applicability and continuing effect that

implements or interprets law or policy, or describes the

organization, procedure or practice requirements of any agency."

N.J.S.A. 52:14B-2(e). When an administrative agency action meets

that definition, "its validity requires compliance with the

 23 A-2919-15T2
specific procedures of the APA that control the promulgation of

rules." Airwork Serv. Div., Div. of Pac. Airmotive Corp. v. Dir.,

Div. of Taxation, 97 N.J. 290, 300 (1984), cert. denied, 471 U.S.

1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985).

 Whether an agency must undertake formal rulemaking depends

on the extent to which the agency's action

 (1) is intended to have wide coverage
 encompassing a large segment of the regulated
 or general public, rather than an individual
 or a narrow select group; (2) is intended to
 be applied generally and uniformly to all
 similarly situated persons; (3) is designed
 to operate only in future cases, that is,
 prospectively; (4) prescribes a legal standard
 or directive that is not otherwise expressly
 provided by or clearly and obviously inferable
 from the enabling statutory authorization; (5)
 reflects an administrative policy that (i) was
 not previously expressed in any official and
 explicit agency determination, adjudication
 or rule, or (ii) constitutes a material and
 significant change from a clear, past agency
 position on the identical subject matter; and
 (6) reflects a decision on administrative
 regulatory policy in the nature of the
 interpretation of law or general policy.

 [Metromedia, Inc. v. Dir., Div. of Taxation,
 97 N.J. 313, 331-32 (1984).]

Formal rulemaking may be required if the factors favoring

rulemaking predominate. Id. at 331.

 Although the Division's interpretation applies to a broad

segment of the regulated population, and it is intended to apply

to all similarly-situated hospitals, the interpretation was not

 24 A-2919-15T2
intended to operate only in future cases. Furthermore, the Division

interpreted the regulation, which has been in effect since 1993.

As we have determined, the Division's interpretation is consistent

with the language of the rule. It was not inconsistent with any

previously-announced interpretation of policy. In addition, the

Division's interpretation of the rule was not a material or

significant change of past agency policy.

 Therefore, the Division's interpretation of N.J.A.C. 10:52-

5.17(a) does not constitute "rulemaking" under the APA. The

Division was not required to engage in the APA's rulemaking

procedures before implementing and applying its interpretation to

the Hospital.

 VII.

 The Hospital further argues that the Division abused its

discretion by summarily deciding its administrative appeal without

permitting the Hospital to complete discovery. The argument is

entirely without merit.

 Generally, a motion for summary judgment should not be granted

if the opposing party has not been afforded a reasonable

opportunity for discovery. Wilson v. Amerada Hess Corp., 168 N.J.

236, 253-54 (2001). However, to warrant denial of a motion for

summary judgment on this basis, the party opposing the motion must

demonstrate "with some degree of particularity the likelihood that

 25 A-2919-15T2
[the] discovery will supply the missing elements" of its case and

therefore influence the outcome of the litigation. Wellington v.

Estate of Wellington, 359 N.J. Super. 484, 496 (App. Div.) (quoting

Auster v. Kinoian, 153 N.J. Super. 52, 56 (App. Div. 1977)),

certif. denied, 177 N.J. 493 (2003). Furthermore, a decision

whether to grant a motion to compel discovery is reviewable only

for an abuse of discretion. Pomerantz Paper Corp. v. New Cmty.

Corp., 207 N.J. 344, 371 (2011).

 The Hospital contends that it had good cause to communicate

with R.S. and compel his deposition. According to the Hospital,

R.S. had "intimate knowledge" regarding the Division's intended

definition of N.J.A.C. 10:52-5.17(a) and its application in

setting the Hospital's reimbursement rates.

 Based on certain handwritten notes and calculations, the

Hospital asserts that R.S. may have personally calculated an

incentive payment included in the Hospital's 1990 cost report. The

Hospital asserts that this was the only evidence created at the

time the regulation was promulgated.

 According to the Hospital, R.S.'s knowledge as to why the

incentive payment was included in the 1990 report is "crucial to

this dispute." The Hospital also asserts that the ALJ should have

completed his in camera review of the records that the Division

 26 A-2919-15T2
withheld, because if discoverable, these records would provide

some evidence regarding the Division's intent.

 We are convinced, however, that the Division did not abuse

its discretion by finding that summary decision was appropriate

and further discovery not warranted. Here, the Division made a

legal decision when it interpreted the meaning of the regulation,

based on its language, the regulatory history, and other legal

sources.

 The Division was not required to allow the Hospital to

communicate with or depose R.S. before addressing that legal issue.

Whatever personal views R.S. may have as to the meaning of the

regulation, they are not binding upon the Division or its Director.

Furthermore, if R.S. prepared the Hospital's cost report for 1990

and included an incentive bonus payment, there is no evidence that

he did this in accordance with any specific announced policy of

the Division.

 Moreover, summary decision was appropriate even though the

ALJ had not completed his in camera review of the documents that

the Division had withheld. The Hospital contends that the documents

are relevant because they relate to the Division's implementation

and interpretation of the regulation. However, as we have

determined, the Division's interpretation of the regulation was a

legal determination. We cannot assume that the records were

 27 A-2919-15T2
discoverable, or that they had any specific bearing on the legal

issues resolved by the ALJ and the Director.

 We note, however, that both the Division and the Hospital

sought summary decision on the issues raised in the administrative

appeal. Thus, the Hospital apparently believed the legal issues

presented could be resolved based on the existing record, without

the need for further discovery. The ALJ and the Director did not

err by finding that the record was sufficient to resolve the legal

questions presented.

 Affirmed.

 28 A-2919-15T2